<div style="float:right">WHITEHEAD<br>*v.*<br>TULANE.</div>

note, payable three years after date, with an express renunciation of all warranty .on the part of the vendor. Some time after this conveyance, the injunction suit being assigned for trial, and the plaintiff in injunction, *Tulane*, being called and not appearing, a judgment of nonsuit was entered against him. It is proved that fruitless efforts have been since made by the Sheriff to satisfy the writ against *Conner*, or to regain possession of the property, the sale of which was enjoined by *Tulane* in 1847. The value of that property is proved to be eight hundred dollars, the amount of the injunction bond.

These facts make out a case against the defendants of damages to the full extent of the injunction bond signed by them. The legal presumption arising from this continued possession in *Conner* is that the purchase of *Conner's* property by *Tulane* at Sheriff's sale was a simulation. The anomalous sale, pending the injunction suit, to *Barrow*, (who is shown by the record to have claimed other property seized at the same time with this furniture, and under the same execution,) coupled with the equally anomalous call in warranty of *Barrow* by his vendor, are facts which corroborate this legal presumption.

Perhaps it is even unnecessary to advert to these circumstances, inasmuch as the voluntary abandonment of the injunction suit, in the language of the case cited, has fixed the responsibility of the principal and surety in the injunction bond. We allow interest from the date of the judicial demand.

It is, therefore, adjudged and decreed, that the judgment of the District Court, as between plaintiff and defendants, be reversed; that plaintiff recover of *Paul Tulane* and *C. Morel Guiramand*, *in solido*, eight hundred dollars, with legal interest from the 16th February, 1853, until paid, and costs in both courts; and that, as between the defendants and the warrantor, *Robert R. Barrow*, the judgment dismissing the call in warranty be affirmed.

---

### ON A REHEARING.

On an application for a rehearing the court rendered the following judgment:

BUCHANAN, J. The suggestion in the petition for rehearing, that the appellant's brief was filed more than two days after the cause was fixed for trial, comes too late. Parties are bound to take notice of the fixing of causes for trial; and the appellee should have appeared in court, when the cause was called for argument, and moved for a continuance, if he were entitled under the rule of court to do so.

Rehearing refused.

---

THE STATE OF LOUISIANA, on the relation of JOHN M. BELL, *v.* JOSEPH HUFTY.

The address for the removal of *Hufty* from the office of Sheriff of the parish of Orleans was presented to the Governor, and approved by him. His official approval and signature consummated the removal.

Article 97 of the Constitution is in these words: " All civil officers, except the Governor and Judges of the Supreme and Inferior courts, shall be removable by an address of a majority of both Houses, except those the removal of whom has been otherwise provided by this Constitution." Accurately speaking, the Constitution itself nowhere else provides a mode of removing Sheriffs.

STATE
v.
HUFTY.

Article 89 allows the impeachment and the prosecution of Sheriffs. But the power of impeachment, or prosecution for misdemeanor in office, which, in case of conviction, involves a removal from office as an incident, and the power of removal without impeachment, or prosecution, are concurrent powers, both of which are clearly recognized by the Constitution, and neither of which excludes the other

The theory of our representative Governments is, that offices are created, not for individual emolument, but for the public good. And the object of the Constitution was to provide not only for the punishment of official delinquents, which would involve the dismissal from office, but also a mode of removing civil officers, against whom no accusation of crime could be made, or sustained, whenever the public good should require such removal.

It would be rebellion in a Judge to say-that a plain and unqualified grant of power, given by the Constitution to a particular department of the government, was null because he thought it was against common right.

It is hardly tenable to say that a man can have a "vested right" to any public office under our form of government. Certainly it cannot be said of a Sheriff, when, in the language of the 89th Article of the Constitution, the very tenure of the office is, that he shall hold it "for the term of two years, *unless sooner removed*."

The power of removing an officer upon address of the two Houses is not a judicial power, but is essentially administrative, and therefore not within the prohibition of Article 2 of the Constitution, which provides that "no one of these departments, [legislative, executive and judiciary] nor any person holding office in one of them, shall exercise power properly belonging to either of the others." But even if this power of removal did somewhat partake of a judicial character, its exercise would not, on that account, be void, for it is protected by the concluding words of the same Article 2: "No one of these departments, nor any person holding office in one of them, shall exercise power properly belonging to either of the others, *except in the instances hereinafter expressly directed or permitted*."

The verdict of the jury in favor of *Hufty*, in the contested election between *Bell* and *Hufty* was not a bar to the removal of *Hufty* by the Legislature. The question before the court was: Shall *Hufty* receive a commission? The question before the Legislature was: Shall *Hufty* be removed from office? In the one case there were two parties, each urging that he could count the greater number of votes in his favor. In the other case there were no parties, but a mere act of administration. The judgment in favor of *Hufty* has been enforced. *Hufty* has been placed in possession of the sheriffalty.

The reasons assigned in the preamble to the address for the removal of *Hufty*, whatever they may be, cannot vitiate the act of removal, which act was within the constitutional competency of the Legislature, uncontrolled by any superior power. With their reasons, whether good, bad, or indifferent, the judiciary have nothing to do.

While the Legislature has power to remove a Sheriff by address, *proprio motu*, without any accusation preferred by memorial against him, yet Article 97 of the Constitution does not authorize the Legislature to hear evidence upon, and decide judicially, the legality or validity of an election of Sheriff. BUCHANAN, J., dissenting.

Unless the reasons assigned by the Legislature exhibit an unconstitutional exercise of power, they could not be examined judicially. BUCHANAN, J., dissenting.

The exercise of judicial power by the Legislature is unconstitutional, except in the instances expressly directed or permitted in the Constitution. BUCHANAN, J., dissenting.

The identical specifications upon which the relator had contested the election of *Hufty* before a tribunal, the decision of which was final, are the very grounds set forth in the address for the removal of *Hufty*. The address is thus an interference with the legal course of proceedings of the regularly constituted judiciary of the State, and an appellate jurisdiction claimed and exercised by the Legislature. BUCHANAN, J., dissenting.

APPEAL from the Sixth District Court of New Orleans, *Cotton* J.
*Benjamin, Bradford & Finney*, for the relator. *Durant & Hornor* and *Price & Day*, for defendant and appellant.

SPOFFORD, J. The present relator, *John M. Bell*, having produced a commission as Sheriff of the parish of Orleans, *vice Joseph Hufty*, removed, and having given the bond and taken the oath prescribed by law, was, some days since, recognized by this court as its executive officer.

In so recognizing him, this court acted upon the presumption that all things had been rightly done; there was no *contestatio litis*, and the showing made *ex parte* was apparently regular upon its face.

We did not, and do not, regard that action on our part as decisive of the present issue. For the first time we have a controversy touching this matter presented before us according to the forms of law, upon a devolutive appeal from the decision of a tribunal having original jurisdiction, which this court has not.

The defendant has appealed from a judgment of the Sixth District Court of New Orleans, ordering him to surrender to the relator all the papers and other effects belonging to the office of the Sheriff of the parish of Orleans.

There is no dispute as to the power of the Governor to appoint a Sheriff in case the office becomes vacant from any cause during a term. Const., Art. 80. There is no dispute as to the fact that the relator, *Bell*, has been so appointed with the advice and consent of the Senate, and that he is duly qualified to fill the office.

.Then the sole question is, was there a vacancy when the relator was appointed? If there was, the judgment of the District Court is right; if there was not, it was wrong.

The defendant, *Hufty*, is admitted to have been the legal Sheriff of the parish of Orleans until the 21st day of February, 1856, when it is alleged that he was removed from office by the following address of a majority of both Houses of the General Assembly :

" An Address removing from office *Joseph Hufty*, Sheriff of the parish of Orleans.

" Whereas, freedom of suffrage and the inviolability of the ballot-box are the only basis of republican government; and whereas, the great palladium of American liberty has been overthrown and trampelled under foot at the late general election held in New Orleans on the 5th November, 1855, whereby the free expression of the popular will has been illegally suppressed by partisan Commissioners of Elections, who arrogated to themselves the power to disfranchise legal voters, and by bands of lawless men who not only drove peaceful citizens from the polls by intimidation, violence and bloodshed, but even after the polls had been closed, destroyed more than thirteen hundred legal votes which had been received during the election by the Commissioners, to the truth of which outrages the whole population of New Orleans bear witness; and whereas, the late Governor of this State has urged the Legislature to " crush the evil at once, and before it has taken root, and by the most pointed and energetic means;" and whereas, the Legislature is constituted by the organic law the grand inquest of the State, for the protection of the elective franchise from tumult, violence and other improper practice, and to vindicate the constitutional rights of the people rising above and not the subject-matter of ordinary judicial investigation, but totally independendent of and not to be confounded with individual claims to office; and whereas, the 97th Article of the Constitution declares that " all civil officers, except the Governor and Judges of the Supreme and inferior courts, shall be removable by an address of a majority of both Houses, except those the removal of whom has been otherwise provided for by this Constitution;" and whereas, a Sheriff is a civil officer, whose removal is not otherwise provided for by the Constitution ; and whereas, it has been indubitably established to the satisfaction of this Legislature that the constitutional rights of the citizens of New Orleans have been grossly violated in the late election for Sheriff of the parish of Orleans ;

Therefore, be it resolved by the Senate and House of Representatives of the
39

State of Louisiana in General Assembly convened, a majority of the members of both Houses concurring in this address, that *Joseph Hufty*, commissioned as Sheriff of the parish of Orleans, be and he is hereby removed from the office of Sheriff of the parish of Orleans.

Be it further resolved, that this address be presented to the Governor of this State in compliance with the Constitution thereof, and that the same take effect from and after its passage.

(Signed,)                          WILLIAM W. PUGH,
                              Speaker of the House of Representatives.
.(Signed,)                          C. H. MOUTON,
                              Lieutenant Governor and President of the Senate.
Approved, February 21st, 1856,
          (Signed,)                          ROBERT C. WICKLIFFE,
                              Governor of the State of Louisiana."

If this address, thus approved, effected a removal of *Joseph Hufty* from the office of Sheriff, there is an end of the case.

The objection of form, upon the ground that the address purports itself to remove the defendant from office, whereas the Article 97 of the Constitution requires the Executive to intervene upon the request of the Legislature, appears to be untenable. The address was presented to the Governor, and approved by him. His official approval and signature consummated the act. Constitution, Art. 54.

The constitutionality of this Act of removal being then the only matter of inquiry necessary to the determination of this cause, we proceed to its investigation in the following order:

1st. Has the power of removing a Sheriff by means of an address of a majority of the members of both Houses been expressly conferred by the Constitution in any case?

2d. If it has, are there any restraints or limitations laid down elsewhere in the Constitution, which rendered the exercise of the power, in this particular case, null and void?

I. Article 97 of the Constitution is in these words: "All civil officers, except the Governor and Judge of the Supreme and inferior courts, shall be removable by an address of a majority of both Houses, except those the removal of whom has been otherwise provided by this Constitution."

It is conceded that the Sheriff is a civil officer, and that the power of removing him by address is expressly granted under this Article, unless he comes within the last exception, to wit: those officers, the removal of whom has been otherwise provided by this Constitution.

Accurately speaking, the Constitution itself nowhere else provides a mode of removing Sheriffs.

. But it is contended that Article 89, under the title of "Impeachment," (title 5,) brings Sheriffs within the exception to Article 97 by declaring that "the Legislature shall provide by law for the trial, punishment and removal from office of all other officers of the State" [*i. e.* except those enumerated in the preceding Articles] "by impeachment or otherwise."

The power of impeachment or prosecution for misdemeanor in office, which in case of conviction involves a removal from office as an incident, and the power of removal without impeachment or prosecution, are concurrent powers, both of which are clearly recognized by the Constitution, and neither of which excludes the other.

The theory of our representative government is, that offices are created, not for individual emolument, but for the public good. And the object of the Constitution was to provide not only for the punishment of official delinquents, which would involve their dismissal from office, but also a mode of removing civil officers against whom no accusation of crime could be made or sustained, whenever the public good should require such removal.

The Governor alone seems to have been exempted from the possibility of removal without impeachment or prosecution and trial for crime.

Thus, "the Judges of all courts shall be liable to impeachment, but for any reasonable cause, which shall not be sufficient ground for impeachment, the Governor shall remove any of them on the address of three-fourths of the members present of each House of the General Assembly. In every such case, the cause or causes for which such removal may be required shall be stated at length in the address, and inserted in the journal of each House." Constitution, Art. 73.

Clerks of the inferior courts are put upon a peculiar footing. "The Judges of the several inferior courts shall have power to remove the Clerks thereof for a breach of good behavior, subject in all cases to an appeal to the Supreme Court." Constitution, Art. 77.

But as a breach of good behavior may not amount to a crime, Clerks of courts would also seem to be embraced in the purview of Article 89, which commands the Legislature to provide by law for the trial, punishment and removal from office, by indictment or otherwise, of all officers of the State, except the Governor, Lieutenant Governor, Attorney General, Secretary of State, State Treasurer, Judges of the Supreme Court, and all Judges of the inferior courts, save Justices of the Peace; the "trial, punishment and removal from office" of those officers, by way of impeachment, having been provided for in the preceding Articles 85, 86, 87 and 88.

The Commissioners of the Board of Public Works also fall within the scope of Article 89, for whose trial, punishment and removal from office, by indictment or otherwise, the Legislature is bound to provide, although a special mode of removing them is provided by the Constitution itself in Article 133: "The Commissioners may be removed by the concurrent vote of a majority of all the members elected to each House of the General Assembly; but the cause of the removal shall be entered on the journal of each House."

The last clause in Article 97: "Except those the removal of whom has been otherwise provided by this Constitution," seems, therefore, to refer to Clerks of the inferior courts and to Commissioners of Public Works, and, perhaps, might also be held to embrace members of the General Assembly, each House of which is empowered by Article 21 to expel a member with the concurrence of two-thirds. All other civil officers (saving also the Governor and Judges of the Supreme and inferior courts) "shall be removable by an address of a majority of both Houses."

The construction contended for by the appellant, if carried out, would nullify and make surplusage of the whole Article 97. If the removal of all other officers is provided by Article 89, much more is the removal of the Governor, Lieutenant Governor, Attorney General, Secretary of State, State Treasurer and Supreme and inferior Judges provided in Articles 85, 86 and 87, under the same title of impeachment. Judgment in cases of impeachment extends to removal from office, and perpetual disqualification therefor. Constitution, Art.

87. And between Articles 86 and 89 a possible removal of all officers of the State by impeachment or trial and punishment in a proceeding analogous thereto, (by indictment or otherwise,) has been provided for, so that, according to this view, nothing remains for Article 97 to operate upon; the saving clause takes every officer in the State out of its scope; the grant of power in the body of the Article is wholly withdrawn by the proviso. It is impossible thus to violate the plainest canons of interpretation.

The Act of March 15th, 1855, (p. 370) relied upon by the appellant, fully recognizes the two-distinct but co-existing modes of removal indicated so clearly in the Constitution itself. That Act is entitled "an Act to determine the manner and regulate the proceedings in impeachments." It provides only for cases where there is personal accusation of some offence against the officer himself. Even then, in section 3, it provides that if the House shall deem it expedient, after the preliminary investigation, it may abandon the impeachment and fall back upon the alternative and milder course, of removal by address. Conviction under impeachment forever disables the convict from holding office; a simple removal by address entails no such disability. An impeachment implies a personal and ignominious punishment for guilt; a removal by address need not imply any criminality on the party removed; it merely asserts that his interests must yield to the public weal.

We, therefore, conclude that the Constitution in express terms conferred upon a majority of both Houses the power of removing the Sheriff, by an address presented to the Governor, upon his approval thereof.

II. The second branch of our inquiry then is, are there any restraints or limitations laid down elsewhere in the Constitution which rendered the exercise of the power of removal by address, in this instance, null and void?

We say "elsewhere in the Constitution," because, if the power is expressly granted, we disclaim the right to limit or control it by considerations outside of the Constitution. We are not the makers but the expounders merely of the paramount law. We cannot add one jot or tittle to its terms. We cannot, by glosses and interpretations, subtract one particle from its substance. It would be rebellion in a Judge to say that a plain and unqualified grant of power given by the Constitution to a particular department of the government was null, because he thought it was against "common right." And it would be an assumption of sovereign authority for the Judge to say: "I will construe, qualify and pare away this unqualified grant of power, so as to make it consort with my ideas of common right."

Fixing our eyes, then, on Article 97 of the Constitution, as the source and measure of the legislative power in this instance, we find it to be untrammeled by any conditions or reservations. It says simply that the class of officers to which the Sheriff belongs "shall be removable by an address of a majority of the members of both Houses."

Looking at provisions for the removal of other officers, we find each qualified in a way peculiar to itself.

"For any reasonable cause, which shall not be sufficient ground for impeachment, the Governor shall remove any of them [the Judges of all courts] on the address of three-fourths of the members present of each House of the General Assembly. In every such case, the cause or causes for which such removal may be required, shall be stated at length in the address and inserted in the journal of each House." Constitution, Art. 73.

· Clerks of the several inferior courts may be removable by the Judges thereof, "for breach of good behavior; subject in all cases to an appeal to the Supreme Court." Constitution, Art. 77.

Commissioners of Public Works "may be removed by the concurrent vote of a majority of all the members elected to each House of the General Assembly; but the cause of the removal shall be entered on the journal of each House." Constitution, Art. 133.

When we consider how carefully every word is weighed in framing the fundamental law of a sovereign State, the omission in Article 97 of all these various qualifications affixed to the power of removal in other cases, becomes significant of a purpose. It leads us to the conclusion that the makers of the Constitution intended to leave the power of removing the civil officers embraced in Article 97 absolutely to the prudence of a majority of both Houses of the General Assembly, unless the exercise of the power in a particular case should come in conflict with a positive inhibition contained elsewhere in the same instrument.

It has been contended for the appellant that such an inhibition is found in Article 105 : "No *ex post facto* law, nor any law impairing the obligation of contracts shall be passed, nor vested rights be divested, unless for purposes of public utility, and for adequate compensation previously made."

It is hardly tenable to say that a man can have a "vested right" to any public office under our form of government. Certainly it cannot be said of a Sheriff, when, in the language of the 80th Article of the Constitution, the very tenure of his office is, that he shall hold it "for the term of two years, *unless sooner removed.*"

Again, it was said that an implied restraint upon the power of removal by address is to be found in Article 103 of the Constitution: "Prosecutions shall be by indictment or information. The accused shall have a speedy public trial by an impartial jury of the vicinage; he shall not be compelled to give evidence against himself; he shall have the right of being heard by himself or counsel; he shall have the right of meeting the witnesses face to face, and shall have compulsory process for obtaining witnesses in his favor." But here was no prosecution. No accusation was made against the defendant. No accusation was necessary. The argument that the Act was void because the defendant had no hearing and no notice, confounds the unrestricted power of removal by address under Article 97 with the distinct but concurrent power of removal which results from a successful impeachment or prosecution for misdemeanor, when the party accused must have a trial, pursuant to the Articles under the head of impeachment. This distinction, founded in reason, and recognized both by the Constitution and laws, has already been developed.

Finally, it was urged that the address in this case was an usurpation by the Legislature of a judicial power, and therefore within the prohibition of Article 2 of the Constitution. The power of removing an officer upon address of the two Houses is not a judicial power, but is essentially administrative. As we have seen, this proceeding, having for its end the public welfare and not the punishment of an individual, is not at all in the nature of an impeachment, which requires a trial, and of which, in case of conviction, the removal from office is a mere consequence, making a necessary part, but only a part, of the sentence.

STATE
v.
HUFTY.

'Even if there were something of a judicial character in the proceeding, it would not be void on that account, because the Constitution itself has vested unqualified power over this subject in the legislative department, and the case would come within the saving clause of Article 2: "No one of these departments, [*i. e.* the legislative, executive and judiciary,] nor any person holding office in one of them, shall exercise power properly belonging to either of the others, *except in the instances hereinafter expressly directed or permitted.*"

We therefore find no other Article of the Constitution which so modifies Article 97 as to render the exercise of the removing power in this particular case null and void.

But as it has been pressed with much earnestness that the verdict and judgment in favor of the defendant, *Hufty*, when the present relator, *Bell*, contested his election in the First District Court of New Orleans, before any commission had been issued, formed a peremptory bar to action of the Legislature in this matter, we remark :

1st. There is no element of the *res judicata* in that judgment which could bar the power of removal under Article 97.

The question in one case was, shall *Mr. Hufty* receive a commission ? in the other, shall he be removed from office ?

There were two contending parties in one case, each urging that he could count the greater number of votes in his favor ; in the other there were no parties, the act being an act of administration intrusted by the Constitution, without qualification or control, to a particular department of the government.

2d. The judgment in the case contested between *Bell* and *Hufty* is not disturbed, but has had its full force and effect. That judgment declared the defendant the Sheriff elect. It was no more and no higher evidence of title to the office than the return of the proper officer in his favor would have been in case there had been no contest. The judgment was final, just as the return would have been if not contested within the legal delay. No appeal lay from it. No new trial could be granted. No second suit could be instituted by *Bell* contesting the election of *Hufty*. The judgment secured to the defendant the commission and station of Sheriff of the parish of Orleans for two years, "unless sooner removed." No verdict and no judgment could expunge that condition from the tenure of his office, for it was inserted in his commission by the Constitution itself. The defendant, therefore, has had the fruits of his judgment ; he has been Sheriff of the parish of Orleans ; until removed he reaped its emoluments, and his right to do so, and the binding force of his official acts until his successor was qualified, can never be questioned, for the judgment of the First District Court is unreversed and irreversible.

3d. There are reasons assigned for the act of removal, in the preamble to the address, other than those pleaded in the controversy between *Bell* and *Hufty* upon the legal inquisition into the state of the vote.

4th. If the Act of removal was within the constitutional competency of the Legislature, uncontrolled by a superior power, as we have found it to be, the reasons assigned by the preamble to the address could not, in any case, vitiate the Act, so as to authorize the judiciary to annul it. The independent and co-ordinate department of the government to which this whole business has been exclusively confined is composed of men who, like ourselves, act under the sanction of official oaths, and who render their account, not to us, but to their consti-

tuents, the people. When they do an act within their constitutional sphere, we, as Judges, have no right to say whether the reasons they give for it are good, bad or indifferent, much less to veto the Act because we find the reasons for it open to criticism. As well might it be said that another department of the government might set aside the final judgments of this court, because the reasons assigned for such judgments are lacking in solidity. To the people alone are the two Houses responsible for the purity of their motives, the sufficiency of their reasons, and the wisdom of their conduct in this matter.

We, therefore, pass in silence what was said at bar, on the one side, as to the hardship of removing an officer for no alleged fault of his, and without a hearing, and on the other, as to the necessity of teaching all men to revere the sanctity of the ballot-box and the freedom of the elective franchise, which are the life of republican institutions. These arguments touch a question of expediency only; they were doubtless considered in the legislative halls before the measure was adopted, and may be considered again in popular assemblies where legislators give an account of their stewardship; but they cannot with propriety be permitted to disturb the deliberations of this tribunal, removed, as it is and ever should be, from the arena of political strife.

Mr. Justice VOORHIES and Mr. Justice LEA concurring in this opinion, and Mr. Chief Justice MERRICK concurring in the decree for separate reasons: It is, therefore, ordered and decreed that the judgment of the District Court be affirmed, with costs.

MERRICK, C. J. However desirable the mature consideration of constitutional questions may be in ordinary cases, we have thought that on account of the important public interests which are suspended during this litigation, that the case ought to be disposed of at the earliest moment practicable.

It may be against common right that any person should be deprived, without fault on his part, and without being heard, of the office to which he has been elected. But so far as it concerns the address of the Legislature removing *Mr. Hufty*, it is probably in the same form it would have assumed if charges had been preferred against him, and he had, as is usual in other cases, been heard upon the floor of the house. We are not therefore permitted to infer anything unconstitutional on account of the mere form of the proceeding. On the contrary, we are bound to presume that the proceedings are regular; for the members of the two houses are the sole judges of the regularity of the proceedings before them, except in those particulars only, which are prescribed by the Constitution, and we have no more right to question the reasons or causes, or successive steps in their proceedings, than they would have to review the proceedings, orders and decrees of this court.

Neither do I consider that we have the right to determine whether the motives which have influenced the Legislature, are or are not sufficient to justify the address. The exclusive control of this matter has been, by the Constitution, vested in the Legislature, as to all offices not otherwise expressly provided for in that instrument.

The members of the two houses alone are the judges of the grounds and causes of the removal, and as this power has been confided by the people to their representatives, it would seem that they are responsible alone to the people for its exercise or abuse.

But it is said that the Constitution commands the Legislature to provide by law for the trial, punishment and removal from office, by indictment or other-

wise, of all other officers, except the Governor, Lieutenant-Governor, Attorney General, Secretary of State, State Treasurer and the Judges of the Supreme and District Courts; and the Legislature having obeyed the injunction of the Constitution in this particular, are themselves obliged to follow the law which they have enacted.

The argument is conclusive, if Article eighty-nine of the Constitution applies to the same class of cases as Article ninety-seven. But I find Article eighty-nine under the title of Impeachments, and the provisions in it became important, because several offices were omitted from Article eighty-six, (providing for impeachments,) such as Auditor of State, Superintendent of Public Education, Commissioners of the Board of Public Works, Sheriffs, Recorders, Justices of the Peace, Notaries, &c. As these important officers were not required by the Constitution to be impeached before the Senate, it was left to the Legislature and made its duty to provide by law the manner in which they should be tried. I am therefore inclined to think that Article eighty-nine applies only to such offences committed by the inferior officers, as would, in the officers enumerated by Article eighty-six of the Constitution, give rise to an impeachment before the Senate. But when we compare Articles seventy-three ninety-seven and one hundred and thirty-three, with eighty-six and eighty-nine, we find the former provide for another class of cases, (viz,) the removal of officers for causes not affording sufficient grounds for an impeachment. In the case of Judges, the cause must be stated in the address and inserted in the journals of the Senate and House of Representatives. In all other cases, (the Governor alone excepted,) a bare majority of the members of both houses have the power to remove, and it does not appear to be important that the cause should be stated in the address or inserted in the journals of the House or Senate, with the exception of the Commissioners of the Board of Public Works, who, although subject to removal by a bare majority of the members elected, must have the causes of their removal inserted in the journals of the two houses.

The object of these provisions is doubtless to enable the Legislature to remove men from office who, from infirmities or other causes, have become incapable of discharging the duties of their office. Debates in Convention of 1845, p. 671.

The Constitution looks rather to the qualification of the incumbent than other grounds of removal, and an exercise of this power upon purely party considerations, would be as much an abuse of power as would be the like reasons for the judgments of this court. But should the members of the Legislature so far forget the duties imposed upon them by the Constitution and their office, as to be governed by such motives, I know of no power save public opinion and the ballot-box by which their acts are to be revised.

Again I do not consider the re-enactment of the statute of 1826 by the Legislature in 1855, a compliance with the injunctions of the Constitution of 1852. Bullard & Curry Dig., p. 470. This old statute, which has been re-enacted, provides the mode by which any one may lay before the Legislature the grounds for an impeachment or removal by address of any officer subject to impeachment before the Senate. But as Justices of the Peace cannot be impeached in this manner, the Legislature has not yet, in my opinion, obeyed the injunction required by Article eighty-nine, which was, without doubt, mandatory as to all officers not subject to impeachment before the Senate, under the Constitu-

tion.  I do not therefore think that the Act of 1855 excludes the other mode of proceeding, even on the grounds urged by defendant's counsel.

It has been admitted in argument that the address removing *Mr. Hufty* was voted upon considerations not at all personal to him; that it was not pretended that he had committed any act which was a ground of removal on his part.

On this state of facts, it is argued by defendant's counsel, that it is against common right that a man should be deprived of his office without any fault on his part and without an opportunity of being heard in defence.

It is undoubtedly repugnant to all our notions of correct administration of justice, to deprive a citizen of the smallest right without a hearing, and much more to take from him an important office.  But that is not the question before us: it is one of power.  Has the Legislature the power to remove one of this class of officers without a hearing?  As liable as such a power may be to abuse in the hands of mere partizans, I think it is vested in the two houses as to all officers, except the Governor, the Judges and perhaps the Commissioners of the Board of Public Works.

An impeachment requires a process by which a party is brought to trial. And perhaps in those cases where the Constitution requires a cause to be assigned for removal, it pre-supposes a hearing upon that cause in order to ascertain whether it is real or imaginary.

But where it is not necessary, under the Constitution, to assign any cause for the act, I am not prepared to say that any other mode of hearing is absolutely required than the usual channels of information upon which the ordinary legislation and action of the two houses are based.

The important questions presented by this case, although illustrated by masterly arguments on both sides, are not free from difficulty, and it is not without hesitation that I arrive at the conclusion that the judgment of the lower court should be affirmed.

BUCHANAN, J., dissenting.  This record presents to my mind, a case of unconstitutional assumption of power on the part of the legislative department of the State government.

The first article of the State Constitution declares: "The powers of the government of the State of Louisiana, shall be divided into three distinct departments, and each of them be confided to a separate body of magistracy, to wit, those which are legislative to one, those which are executive to another, and those which are judicial to another."

Article 2. "No one of these departments, nor any person holding office in one of them, shall exercise power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

Article 3. "The legislative power of the State shall be vested into two distinct branches, the one to be styled the House of Representatives, the other the Senate, and both the General Assembly of the State of Louisiana."

Article 61. "The judiciary power shall be vested in a Supreme Court, in such inferior courts as the Legislature may from time to time order and establish, and in Justices of the Peace."

The Legislature has carried into effect this last article of the Constitution, by establishing courts with various attributes of jurisdiction; to one of which courts so established, the First District Court of New Orleans, it has given authority, by an Act approved 15th of March, 1855, to hear and determine

contests of elections of Sheriff in the parish of Orleans. "The Judge," says the Act, section 41, "shall proceed without delay to examine the grounds of contestation; and may, on the application of either party, order a jury to try the issue, and its decision thereon shall be final." And by section 45: "The issue thus formed, shall be proceeded with summarily before court and jury. The trial shall be conducted and submitted to the jury according to the laws by which other jury trials are governed. A majority only of the jurors shall be required to return a verdict. The jury shall have power to determine by their verdict, which of the parties is entitled to the office; or to refer the same again to the people. The court shall have no power to grant a new trial, as in other cases, and no appeal shall be allowed."

Section 46. "The judgment rendered upon the finding of the jury shall be final; and on certifying the same to the Governor, a commission shall be issued by him in favor of the person in whose favor the verdict may be."

On the 5th of November, 1855, an election of Sheriff was held in the parish of Orleans, *Joseph Hufty* and *John M. Bell*, being the candidates; and the former being returned elected, the latter contested his election by a petition presented to the First District Court of New Orleans, with the formalities prescribed by the Act of 1855. This contest was tried by a jury, which rendered a verdict in favor of *Hufty*, by a majority of seven to five; and judgment was therefore rendered by the court, "that *Joseph Hufty* is declared to be the Sheriff elect of the parish of Orleans, and is entitled to enter upon the discharge of the duties of Sheriff, upon complying with the formalities prescribed by law.

Upon this judgment being certified to the Governor, he issued a commission of Sheriff to *Hufty*, dated December 31, 1855.

The grounds upon which *Bell* contested the election of *Hufty*, were eleven in number, being specifications of illegal acts and decisions of the commissioners of election in refusing to receive legal votes; and acts of violence in destroying the ballot boxes and scattering the votes, committed by bands of lawless men, at the polls.

We have seen that the special tribunal created by law for the trial of such an issue, a judicial tribunal, composed of a Judge and jury, did judicially investigate and decide upon all the facts of illegality and violence alleged to have taken place at the election of Sheriff in the parish of Orleans, on the 5th of November, 1855, and that its decision in the premises is, by law, final and without appeal.

In the language of the second article of the Constitution, the power of deciding the question of the legality and validity of *Hufty's* election as Sheriff, the question raised by the opposing candidate, *Bell*, assisted by twenty voters, was a power properly belonging to the judicial department of the government. This proposition is beyond all question. It follows, therefore, of necessity, that neither of the other departments of the government (legislative or executive) could constitutionally exercise that power, unless the direction or permission to do so, can be found in the Constitution itself. A careful scrutiny of that instrument in all its articles, has failed to show me any thing indicating such a direction or permission. I am clear that the 97th Article neither directs nor permits anything of the sort. I admit that that article authorizes the removal of a Sheriff by an address of a majority of the members of both Houses, for the Sheriff is certainly a civil officer, and I do not understand the

Act No. 304 (page 370) of the Session Acts of 1855, as having imposed any restraint upon the action of the General Assembly, *proprio motu*, in the way of address. The provisions of that Act seem to be intended for the case of accusations preferred by individuals against public officers, in the form of a memorial addressed to the Legislature; which accusations, after the observance of certain rules of proceeding in the Act set forth, may result in an impeachment or in an address, as the Legislature shall determine.

The Act was undoubtedly intended to carry out the articles of the Constitution on the subject of impeachments, and the removal of public officers from office generally. But I do not find in it, any provision to the effect, that every address for the removal of an officer, must be preceded by those formalities which are therein indicated as essential to be pursued upon a memorial presented to the Legislature, and containing accusations against a public officer.

But while I make the admission that the Legislature has power to remove a Sheriff by address, *proprio motu*, without any accusation preferred by memorial against the officer removed, yet I repeat that the Article 97 does not authorize the Legislature to hear evidence upon, and decide judicially, the legality or validity of an election of Sheriff. And this is what the Legislature has done in the case at bar.

At the risk of appearing tedious, I will repeat the whole of the preamble, which constitutes what may properly be called "The Address," being introductory to the resolution for the removal of *Hufty*, and containing the reasons justificatory of such removal.

"Whereas, freedom of suffrage and the inviolability of the ballot box are the only basis of republican government; and whereas, this great palladium of American liberty has been overthrown and trampled under foot at the late general election held in New Orleans, on the 5th of November, 1855, whereby the free expression of the popular will has been illegally suppressed by partizan Commissioners of Election, who arrogated to themselves the power to disfranchise legal voters, and by bands of lawless men, who not only drove peaceful citizens from the polls, by intimidation, violence and bloodshed, but even, after the polls had been closed, destroyed more than thirteen hundred legal votes which had been received during the election by the Commissioners, to the truth of which outrages the whole population of New Orleans bear witness; and whereas, these facts have been brought to the knowledge of the Legislature by judicial investigations, and by executive communications; and whereas, the late Governor of this State has urged the Legislature to 'crush the evil at once, and before it has taken root, by the most pointed and energetic means'; and whereas the Legislature is constituted by the organic law the grand inquest of the State, for the protection of the elective franchise from tumult, violence and other improper practice, and to vindicate the constitutional rights of the people, rising above and not the subject-matter of ordinary judicial investigation, but totally independent of, and not to be confounded with, individual claims to office; and whereas, the 97th Article of the Constitution declares, that 'all civil officers, except the Governor and Judges of the Supreme and Inferior Courts, shall be removable by an address of a majority of the members of both Houses, except those, the removal of whom has been otherwise provided by this Constitution'; and whereas, a Sheriff is a civil officer, whose removal is not otherwise provided for by the Constitution; and whereas, it has been indubitably established to the satisfaction of this Legisla-

ture, that the constitutional rights of the citizens of New Orleans have been grossly violated in the late election for Sheriff of the parish of Orleans: Be it Resolved," &c.

It is said, that the Supreme Court has nothing to do with the reasons contained in the address for the removal of *Hufty ;* that for the decision of this issue, it suffices, that the Legislature has a constitutional right to remove a Sheriff by an address of a majority of both Houses; that as well might it be contended, a decree of the Supreme Court, in a matter within its jurisdiction, is invalid, because the reasons given by the court for its decree, may happen to contain bad logic or bad law. But with all deference to those who entertain such an opinion, and professing what I truly feel, a profound respect for the legislative branch of the government, yet I cannot forget that it is the peculiar province of this tribunal, to expound in the last resort, those rules of action and acts of administration which are contained in the statutes promulgated as the expression of legislative will in the State of Louisiana; to determine if, at any time, the consistency of such enactments with the State Constitution be drawn into question, whether in truth they are in contradiction; and in case they be, to pronounce that the statute must yield to the Constitution, as the paramount law.

The Supreme Court of the United States, in a case in 3d Dallas, to which I will have occasion again to refer, have said, that the State courts are the proper tribunals to decide, whether laws contrary to the State Constitution are void.

In the present case, the unconstitutionality of the address removing the defendant from office, is expressly pleaded; and is in fact the only matter at issue. To determine this plea, we must needs examine the address itself. And as this is the first occasion of the exercise of the power of removal of an officer, by address, under this Constitution, we are without precedents to guide us in the construction of the article of the Constitution, in virtue of which the removal is said to have been made, and which is copied into the address. The first thing that strikes me in Article 97, is that the address and the removal are simultaneous. The words used are, "shall be removable by an address." It is not, as in the Article 73, the Governor, who is to remove upon an address of the Legislature; but the General Assembly itself removes the officer. The removal is strictly an Act of the Legislature, under this article. And it is plain, that the Legislature have, in the case before us, taken this view of the article. For the address, after the preamble copied above, proceeds to remove *Hufty* from office by resolution. By a second resolution, indeed, it is directed that the address be presented to the Governor. But this, I understand to have been done in compliance with Article 54 of the Constitution, which requires that "every order, resolution or vote, to which the concurrence of both Houses may be necessary, except on a question of adjournment, shall be presented to the Governor, and before it shall take effect, be approved by him, or being disapproved, shall be repassed by two-thirds of the members elected to each House of the General Assembly."

The address under the Article 97 of the Constitution is, therefore, neither more nor less, than an ordinary Act of the Legislature; and the form of an Act of Assembly, which is the one adopted on this occasion is, in my opinion, the correct form of an application of the Article 97 of the Constitution. Why, then, has the peculiar appellation of "address" been used by the framers of

our Constitution in this article? Here, again, I think the Legislature has correctly interpreted the meaning of the article. The order, resolution or vote, for the removal of an officer, is something more than "*sic volo, sic jubeo ; sit pro ratione voluntas.*" It is a solemn manifesto by the Legislature to its constituents, of the causes which have moved it to take the extraordinary step of abridging the term of office of one who has seemed worthy to his fellow citizens, of being selected to discharge the duties and receive the emoluments of a post of honor and profit in their service; a declaration of motives, which it must be presumed the Legislature will never be either afraid or ashamed to make, which is in thorough consonance with the spirit of our institutions, and which is due as well to that portion of the people who have given their votes at the election of the officer, as it is to the officer removed himself. Let us not be told, that because, in this country, a man has no property in an office, it is, therefore, unnecessary to give any reason for depriving him of it. I should be loth to admit that any man, by accepting office under our government, has degraded himself so far below the level of his fellow citizens, that when disgraced by the infliction of a penalty which implies dishonor, or impoverished by the sudden withdrawal of an income upon which he had good reason to calculate for some time to come, he shall have no right to be informed in what he has sinned, or in what respect he has been found wanting.

Such is not the meaning of the 97th Article of the Constitution; neither is such the interpretation which the Legislature have given to it on this occasion. Their act is truly an "address"—a declaration to the world of the motives of their proceedings.

We know, then, from the most authentic source, what were the reasons for defendant's removal from office by the Legislature. And I agree that, unless those reasons exhibited an unconstitutional assumption of power, they could not be the object of examination before this court. The exercise of judicial power by the Legislature, is unconstitutional, except in the instances expressly directed or permitted in the Constitution.

Have the Legislature exercised judicial power in this instance?

The address sets forth the rejection of legal votes by the Commissioners of Election, and the destruction of the votes which were received, by bands of lawless men. These were the identical specifications on which the relator had already contested the election, before a tribunal whose decision, by a statute yet unrepealed, was final. I find in this, an interference with the legal course of proceedings of the regularly constituted judiciary of the State, and an appellate jurisdiction claimed and exercised by the Legislature.

That the jurisdiction thus exercised, is judicial in its character, evidently appears from the statement of the address, that the facts stated "have been brought to the knowledge of the Legislature by judicial investigations." That the power exercised was a judicial power, is furthermore formally enunciated in the declaration of the address, that the Legislature is constituted by the organic law the grand inquest of the State, for the protection of the elective franchise from tumult, violence and other improper practice. The French text of the address is still more expressive—" *Grande Cour d'Enquête*" ; and as the Article 129 of the Constitution requires the laws to be promulgated in the French as well as the English language, the French text is not to be left out of view, in ascertaining what is the meaning of the Legislature.

Is it then true, that the Constitution has made the Legislature a grand in-

quest, or Court of Enquiry, for the protection of the elective franchise from tumult, violence, and other improper practice? Not so. The 93d Article of the Constitution says: " The privilege of free suffrage shall be supported by laws regulating elections, and prohibiting, under adequate penalties, all undue influence therein, from power, bribery, tumult, or other improper practice." This Article of the Constitution has been executed by the adoption of the Act relative to elections, approved 15th of March, 1855, (Session Acts, p. 408,) and of the Act relative to Crimes and Offences, approved 14th of March, 1855. Session Acts, p. 130. Proceedings under both these statutes, are carried on before the ordinary judicial tribunals of the State. The 74th section of the Act relative to Crimes and Offences, punishes violence and riots at elections, and I do not understand our predecessors as having decided, in the cases of *Rice* v. *Dubuys*, and *Borgstede* v. *Clark*, in 5th Annual, as is contended by the counsel for the relator, that the verdict of the jury in a contested election under the Act of 1846, (from which the Act of ·1855 is copied,) was not final in regard to the validity and legality of the election.

The learned counsel of the relator, has also referred to two decisions of the Supreme Court of the United States, *The Baltimore and Susquehannah Railroad* v. *Nesbit & Goodwin*, 10 How., 395, and *Calder* v. *Bull*, 3 Dallas, 386, in support of the constitutionality of a review by the Legislature of a State of a judgment rendered by the courts of the State. But an enunciation of those decisions will show that they constitute no authority in the present case. In that from 10 Howard, indeed, the only point presented by the plaintiff in error was, that the statute of Maryland complained of, divested vested rights and impaired the obligation of a contract. The court indulged, it is true, in some remark, *arguendo*, upon the distributions of powers, legislative, executive and judicial, in the Constitutions of the several States, as a matter not to be inquired of except by the State authorities; but it concludes those remarks by declaring that "no such inquiry regularly arises upon this record"; and the unqualified proposition stated by the reporter in his head notes of the case, " the States have a right to direct a rehearing of cases decided in their own courts," does not appear warranted by anything in the decision.

As to the case from 3d Dallas, which is a very remarkable case, as being the leading one upon the definition of the phrase " *ex post facto* law" in the Constitution of the United States, it was certainly decided therein, that an Act of the Legislature of Connecticut, granting a new trial upon a judgment of a Court of Probate of that State, refusing probate of a will, was in conformity to the Constitution of that State, which was then (in 1798) nothing more than a royal charter of Charles the Second of England. The following is the language of Mr. Justice Iridell upon this subject: " From the best information to be collected relative to the Constitution of Connecticut, it appears that the Legislature of that State has been in the uniform, uninterrupted habit of exercising a general superintending power over its courts of law, by granting new trials. It may, indeed, appear strange to some of us, that in any form, there should exist a power to grant, with regard to suits depending or adjudged, new rights of trial, new privileges of proceedings, not previously recognized and regulated by positive institutions; but such is the established usage of Connecticut, and it is obviously consistent with the general superintending power of her Legislature."

From these remarks, it will be seen that the difference between the Constitution of Connecticut in 1798, and that of Louisiana in 1856, is simply this: that the former sanctioned the reversal of a judgment of a judicial tribunal by the Legislature, and the latter prohibits such a reversal. For the same reason, therefore, that the statute of Connecticut was held to be valid, the address for the removal of the defendant should, in my judgment, be held to be void and of no effect.